Good morning, Your Honors. May it please the Court. In May 2016, Endologix began making a series of statements about its Nelix EVAS device, its surgical device, device used in surgery for aortic aneurysms, to seal them. And they made a series of very positive statements about two things. One, about how the data looked, the existing data. So that's a current and historical statement of fact, of present fact. And based on those false statements that the data was good, they said they remained on track for PMA approval, that there was nothing in the data that would affect approvability. They also made statements about how the Nelix device was doing in Europe. So beginning in early 2013, approximately February 2013, it was marketed in Europe. And by 2016, by mid-2016, about 5,500 patients had the device implanted in them. And so they had quite a bit of data. And beginning in 2015, early 2015, Endologix noticed that there was serious problems with migration of the device from the site of implantation, so that it was endangering patients' lives. And throughout 2015, the problem got worse and worse, until in October 2015, it became a crisis situation. Confidential Witness One, who was initially the Director of Research and Development, hired specifically to work on the Nelix device. He then became Director of Aortic Procedure Development. His job being to work with the clinical trials on Nelix in Europe, also to work with the doctors in Europe, because most of the clinical trial patients were in Europe. So the global registry were international centers, and a large portion of the forward IDE study was international patients. So he was involved in not just the clinical trial development, but also dealing directly with the doctors, where the direct channel, the sale of the device So he had very, very good firsthand knowledge, personal knowledge, as to how the product was doing. And he said that beginning in, by October, November 2015, it was a crisis situation. They had an all-hands meeting with Defendant McDermott, the CEO, and Defendant Mahbub, the CFO, along with the Director of Global Clinical Affairs, and they sat down and tried to find out what the problem was. Well, they discussed how to solve the problem. The only thing they could figure out, they had no idea why the device was migrating. What they did know, the only commonality they could find out, was that it was migrating with the CEO, Mr. McDermott. But there was awareness of a problem, that migration was an issue, that it would show up in the longer-term data, the longer the product was used. How does that give rise to a strong inference that they were making false statements on track for approval? Because they knew that approximately 40% of the patients, according to McDermott, he admitted it was about 40% of the patients that would fall under the revised IFU. And in the global registry, the company admitted in a later presentation, there were at least 37%. So it was about 40% of patients were affected by this. And they pleaded with Mr. McDermott to revise the IFU in November 2015 to protect patient safety. He refused. He refused. Why did he refuse? Because if he refused, two things were going to happen. It was going to delay approximately two years, clinical approval, because the existing trials for the U.S. approval would have to, they needed additional patients. They'd be 115 patients short, right, because they'd throw out 40% of their 500 patients. Isn't the concept that they knew that this was doomed to failure, that they were never going to get the approval on the schedule? No, well, they knew that, well, it was the risk that the approval was at substantial risk. In other words, the risk was much greater than they suggested. There's always risks of something going wrong, right? But they consistently reassured investors at every turn. At every conference call, he said, getting approval is our top priority for the company. That's what he said. At every conference call, it's in the excerpts of the record, the supplemental excerpts of the record, the conference calls. Top priority for the company. And each time investors asked, how are things going? For example, how are things going in the European channel? Fantastic performance. No surprises with Nellie. Fantastic performance. Now, the trial court said, well, he could have been talking about just their sales. But just as in Zycam, where, I'm sorry, Matrix, in which the product Zycam was having problems, where they were, it was believed there could be a link to loss of smell, that was only based on a very small number of reports. But knowing of those problems, the Supreme Court found that the statements that everything, that the sales were going well, that things were great, were false and misleading. And so it's very similar to that. They weren't obligated to give reassurance to the investors. But they did, and they did so falsely, because they were well aware of very serious problems. And, you know, the level, like he, so if you look at what the courts in, well, in ARENA, in the Srinivan ARENA case, for example, as well as in Matrix, what types of actions show scienter? In the Matrix case, they said that, the Supreme Court said that by initiating an addition, they asked another doctor to do some additional study work, right? And that, the Supreme Court said, gave rise to an inference that they knew it was a serious problem. Here, the CEO created a task force. They had five people working on this problem, nonstop. That's what they said. They were doing this every day. They were giving weekly, if not sometimes daily reports to the CEO about their success or lack of success in trying to find a solution to the migration, to try to fix it. And so that's very similar to Matrix. And it's also, I think, very similar to the Srinivan case in the sense that they're aware of these problems. Now, look, in ARENA, ultimately. Counsel, the question isn't whether they were aware, whether issues that had arisen. The question is, what did they say about that? And Judge Collins' question to you was, you know, that's a pretty general question. You know, we're doing fantastic in Europe. Because if they're talking about sales in Europe, yeah, it looks like things were on the up. Things were good. And that seems like that would be responsive to that. And the data is, is that scientific data? Is that financial data? I mean, the question is, what did they represent to investors at the time? So when they're talking about the data, they're clearly talking about data being submitted to the FDA in support of the clinical trial. Now, the strongest, certainly the strongest statement is on the August 2nd conference call, August 2nd, 2016. So one analyst asks, can you give us, she says, I'm sure you're eager to provide the intimate details of your FDA discussions, but maybe give us a little bit more color, more sense of comfort that there is not something else going on, that there is no sort of red flag raised in terms of data that they saw, the FDA saw. I guess anything that you could give us that gives us any comfort, that would be helpful. So you're reading they as being the FDA? Yes. And then he responds. Sure, so the three reasons, this is McDermott, there are three reasons that the agency, so he clearly understands that to be the FDA, will typically consider sending a device to PAL, is one, if there is any new clinical issues of safety or efficacy. And then he says, obviously everyone has seen the data, so we know there aren't any issues there. Does this follow the Liverpool study?  Well, I understand he didn't mention the Liverpool study. That wasn't my question. My question was, did this statement follow the release of the Liverpool study? Yes. Because the Liverpool study was published in April of 2016. Yes, and he said, and he made the point that that was one-year data. But that was also the most formal study that had been conducted really by anybody. I mean, it was a study that was released publicly. It was 18 patients done by a hospital based on the hospital's experience with Nellix up to a year. So it was, compared to the clinical data that the company had, it was tiny and, I don't want to say insignificant, but of no import because the company had 6,000 patients by that time, 500 in clinical trials, and 5,500 in its commercial use, which dwarfed. And so where in your complaint is the allegations about the data that the company had, aside from the Liverpool study? Well, so in their 10-Q, their June 30th 10-Q, which is in the supplemental excerpts of the record, it's also, the 10-Q specifically says that they had the IDE, they had 20-month data as of April 2016. They had 20-month follow-up data in the IDE, in the global registry trial. So by August, they had 24-month follow-up data, for sure. That's the June 30th 10-Q. Okay, and where in the complaint does it discuss that data? Paragraph 128, the confidential witness says that when McDermott made those statements on that conference call, first that one about not being any red flags and everyone see the data and there's no issues there. He also said- I'd like to know where the data is. Is the data alleged in your complaint? The conference call, the 10-Q is, like I said, it's in the supplemental excerpts of the record. It's referenced in paragraph 128, and also- Well, 128 refers to the August 2nd statement, and I've got that statement, and that's a very critical statement for you. So your question is what evidence in the record- I'm interested in knowing where in the complaint does it discuss the 10-Q data that you've referred to? I wasn't sure that I saw that, that I saw any allegations about that data. I think it's one-fifth around- Because I asked you about the Liverpool study, and you sort of shoved the Liverpool study to one side, so you're focusing principally on the 10-Q data. Well, we didn't say that the Liverpool study was a false statement. What we said is that he, McDermott, when the Liverpool study was mentioned on the conference call, he said, oh, it's insignificant because it's one-year data, and they're only looking at- They're measuring- They're measuring it. It's got a different- Migration between 4 and 10 million. It's a different definition than we're using in the United States. Fair enough. So where is the data that the company was collecting that was reported in June of 2016? You referred to a June 10-Q statement. I just want to know where in the complaint have you discussed that 10-Q statement? Oh, oh, 153. That- Paragraph 153 is quoting from the 10-Q, which is in the supplemental excerpt of the record, June 30, 10-Q. And I believe that's page 138. Now, in it, he says, we are working very collaboratively with the FDA to provide the required information and remain confident in the PMA approval of Nellix based upon the IDE results. Data from other international studies and our worldwide experience, which now includes over 6,000 patients. So in that statement, the company is saying that in response to the FDA's questions, they've given them all the information, and based on all the information, including their IDE clinical results, data from other international studies, and the worldwide experience, which now includes over 6,000 patients. So that's the European patients. Okay. So is there anything in that statement that's false? Yes. What's false? That they weren't confident? Well, so just- That it didn't come from their patients in Europe? They weren't working collaboratively? What's false in that statement? Because knowing that there's an urgent crisis with patients with migration, and knowing that the FDA has been asking them about that problem and has asked for additional analysis because it's an issue, because what he's saying on that conference call that follows, and he says, oh, there's nothing in the data, there's nothing, he specifically says, there's nothing that could affect the approvability. If you go further down that paragraph, he says, he says, they asked, another analyst says, can we talk a little bit about what type of additional data questions you're receiving? And he says, oh, yes, I don't want to get too detailed, Joan, but what I can tell you is that none of the questions we got asked are what I would characterize as big surprises. Some clarification on things, some requests for additional analysis, some additional testing, nothing that would suggest, in our view, nothing, that's a pretty strong statement, and nothing that would even suggest any question or risk of approvability, or even risk of approvability. Now, he knows at that point that this is a sticking point. I've let you go, but why don't you wrap up. I'll give you a minute for rebuttal as well and add additional time to your opposing. Thank you, Your Honor. So when a confidential witness said twice they begged Mr. McDermott to revise the FIU in late 2015 and then early 2016, revise the IFU, protect patients, he refused. That refusal shows malice, shows bad faith, shows a lack of, his throwing patients under the bus to protect his market share is immoral, and it clearly shows a lack of honesty at the very core. Thank you. Good morning, Your Honors. Jason DeBrethe will appear on behalf of the appellees. This case involves an omission theory, and the facts that are offered in support of that omission theory are all attributed to a single confidential witness, CW1. That confidential witness was only at the company for the first few weeks of a 54-week class period. There's no corroboration of the allegations attributed to CW1. CW1 is alleged to have made sweeping statements replete with inflammatory. The purposes of this 12B6, we have to take those as true. I challenge those, but. That is correct, Your Honor. I think there's an open question whether under the circumstances of this case, where a second amended complaint is filed after the sole CW has disavowed the attributions, whether under those circumstances, the fact of a disavowal may be used to either ignore or lessen the weight given. The district court didn't decide the 12B6. Isn't that? That's correct. Even just to put emphasis on the court's point, it did not reach the Rule 11 issue. That's correct. It also did not answer the question I just raised, which is whether apart from any Rule 11 inquiry, a court ought to give less weight to a disavowed allegation in a complaint. So the court did not rely in any way upon the disavowal. Are you asking us to go outside then what the district court decided? No. It would be within this court's purview to address whether or not a trial court ought to consider a disavowal in determining what weight to put upon attributions to a CW. That is not necessary to this court's review, however, because, again, we would submit the court rightly found that even taking every attribution as correct and putting full weight upon or giving full weight to each attribution, there still were not sufficient facts alleged with the particularity required in a securities class action to establish falsity in CNTR. Why don't we turn to the claims that counsel was relying on, and let's look at those paragraphs 153 to 155. Talk about Mr. McDermott's response to Joanne Wench. I'm with you, Your Honor. Yeah. So if you could talk about Mr. McDermott's response and why nothing in here is false, misleading. Sure. Doesn't show scienter. Yes, Your Honor. So the fundamental problem is what is the nature of the migration problem that's alleged in the complaint? We have only two pockets of data. The data comes from the IDE clinical trial, and it comes from the global registry. The information coming from the commercial experience is just anecdotal reports. So when Mr. McDermott is referring to data, he cannot be and is not referring to the commercial experience. He's referring to either the IDE study or the global registry. And so the plaintiff's theory, as I understand it, is that any kind of positive or affirmative statement about that data is not an affirmative misstatement. It's simply misleading because Mr. McDermott is not at the same time describing the commercial experience, which is alleged to be negative according to the attributions to CB1. As I understand the sort of core theory of the complaint, it's that based on the longer-term use in Europe, there was an awareness in the company that around the year mark, when people have had this long enough, the migration problem starts to show up. Therefore, when you're doing a study in the U.S., you know from that that when you hit the two-year mark, it's going to hit the wall. And to then being aware of that sort of bomb under the desk to just say everything's fine, when you know that this is, as the study runs long enough, the problem's going to show up. That's the basic theory of falsity. Tell me why that doesn't make sense. Well, the problem, Your Honor, is it's alien to the factual allegations in the complaint. The complaint establishes references to a stream of complaints. It's not specific to whether those reports are on-label or off-label. It does not say whether those reports occur in a patient's first year of treatment, second year, or third year. It simply says there's a stream, a deluge of reports. So we don't know. It's just that they were serious enough that the company had an internal task force to try and understand the nature of the problem and to deal with it. Yes, Your Honor. Beyond that, we don't know how relevant, if at all, any of the reports were to the parameters of the IDE application in the United States. And I would direct the Court's attention to SCR 149 and 151, which reflect the responses of Mr. McDermott to questions on November 1st. What's critical about those two extroverts of record are that at 149, Mr. McDermott addresses the IFU, the narrowing of the market that Plaintiff makes much of on appeal. So at that point in time, the market's informed of the restricted patient population the company has imposed in response to the data in the IDE trial. And what does the market do? Well, according to Plaintiff, it yawns. That's not an alleged corrective disclosure. There's no alleged stock drop. But perhaps even more critically, at SCR 151, an analyst asks Mr. McDermott, what about your commercial experience? And he responds by saying, we're seeing reports of migration in the single digits. Now, that is an allegation or disclosure of migration that actually has some particularity to it. It's alien to the allegations in the complaint. But here's the company itself, Mr. McDermott saying, our experience in the commercial channel is single digits. And there's nothing in the complaint to challenge that as being an accurate statement. Well, what does that mean? Well, if you take the Plaintiff's allegation that you have 6,000 commercial patients having been treated, and you assume perhaps even at the low end of a single-digit percentage, that's 2%, we're talking about 120 patients with migration. Well, there then, Mr. McDermott disclosing to the market that there could be 120 patients having migration in the European commercial experience. Now, we don't know if they're on-label or off-label or how relevant they are to the viability of a device under the revised IFU that's being discussed that same day. But there's the defendants accurately describing the commercial experience of migration. And on top of that, Mr. McDermott goes on. He says, well, we also understand that there's underreporting in the commercial channel. So the market at that point is told that there actually is migration in the commercial channel, that it's in the single-digit percentiles, and that the market should assume that it's actually more than that because of underreporting typically in the commercial setting. It's not a clinical study where you have one-for-one reporting. And there's nothing in the complaint that challenges the veracity of that statement. So what do we have? We have on November 1st the market being told about the revised IFU, which according to paragraph 113 of the complaint is the equivalent of disclosing delay, because according to Plaintiff, if you announce a revised IFU, the FDA is going to ask for a confirmatory study or at least more data. So we have that disclosed, but the market does nothing. And we also have the commercial experience being disclosed, and the market does nothing. So what does that mean? That means that Plaintiff has a critical problem with loss causation, with falsity, and even its core emissions theory because the core facts, more than the core facts that are allegedly omitted, are disclosed on November 1st, and the market yawns. I'll just submit that SCR 151 and 159 are fatal to Plaintiff's case. And so even if the court felt that the sweeping conclusory allegations attributed to CW1 were adequate to infer scienter or establish falsity, the problem is that Plaintiff's core theory is disclosed on November 1st with no market drop, and therefore there cannot be a securities fraud plead in this case. And unless there are any further questions, I will yield the rest of my time to my colleague. Thank you. So, Your Honor, to address the statement on November 1st by the CEO, Mr. McDermott, he was asked what the experience for migration was, and he said, in the European channel, and he said, low single digit. Now, that was untrue because if you look at the data, the complaint and other excerpts of the record, so paragraph 134, low single digits was what the IDE trial was after one year, 2.3%. And that passed the primary endpoint. So if the primary endpoint after one year is 2.3% and it's okay, then clearly low single digits in Europe would not be a problem. So he's misrepresenting. He's misrepresenting that statement. I'm just not following the point you're making here. Why is that a false statement? Because the European channel was having substantially more problems than 2.3% because the confidential witness specifically said that there was a spike. In fact, the company admitted there was a spike after one year, a spike between year one and year two, a spike of migrations. So if 2.3% is less than a problem, it meets the primary endpoint, then clearly it's more than 2.3%. It's more than low single digits. But more importantly is that on that November 1st conference call, the CEO said two critical things. First, he said it wasn't going to affect our market share because we're just going to use our other devices, the EVAR device, for these patients who fit outside the revised IFU, number one. Number two, he said it will not affect our timeline for FDA approval. He specifically assured investors it will have no effect. And then two weeks later, he does an about face and says, it's going to be another year for approval. And that's when the stock price drops. And then the analysts quoted in the complaint specifically said, two or three weeks ago they just told us everything was fine, there wasn't going to be a delay, and now we're hearing the situation's far, far worse, and there's a stock drop. So he has been dissembling to investors the entire time that he's on these conference calls, downplaying and concealing serious problems that were affecting the likelihood of approval of this product, as well as concealing that the addressable market was going to be much, much 40% smaller. So these are material facts under Matrix and under ARENA. These are material facts. The likelihood of approval is something investors would definitely want to know about. The company admitted it was a top priority, and the company concealed it. Thank you, Counsel. I've let you go over. Thank you very much. Thank you. The case just argued is submitted.
judges: Bybee, Collins, Bress